**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------x

PAPAYA MEDIA CORP.,

                            Plaintiff,                **COMPLAINT WITH**
                                               **DEMAND FOR JURY TRIAL**

       - against -

HAVEN HEALTH MANAGEMENT, LLC,        Case No. 2:25-cv-2752

                Defendant.
-----------------------------------------------------------x

       Plaintiff Papaya Media Corp. ("Papaya Media"), by and through its attorneys, Lewis & Lin, LLC, as for its complaint against Defendant Haven Health Management, LLC ("Haven Health"), alleges as follows:

<u>**NATURE OF THE ACTION**</u>

    1.  Papaya Media brings this action against Haven Health for violations of the Defend Trade Secrets Act of 2016, misappropriation of trade secrets, breach of contract, fraudulent inducement, and unfair competition.

    2.  This action arises from Haven Health's procurement and exploitation of Papaya Media's proprietary niche marketing services for its own financial gain.

    3.  Papaya Media, through almost 20 years of experience in the digital marketing industry, developed a proprietary method and keyword database that reviews user input to find customers interested in the services provided by a particular business and generate marketing leads for that business. Said differently, Papaya Media developed a proprietary data processing method that correctly and efficiently matches likely customers of a business with that business's advertisements, with an impressive success rate of converting potential customers to paying customers.

4.   Papaya Media is a lead generation company. Specifically, Papaya Media makes income by creating and maintaining digital marketing campaigns, using its proprietary and confidential methods. These digital marketing campaigns generate contacts of potential customers who show interest in a product, or "leads," which are then sold to specific advertisers.

5.   Haven Health, a company that owns and promotes several substance abuse treatment centers, through its agent, contracted with Papaya Media to use its proprietary marketing method to find and advertise to potential customers in need of Haven Health's services.

6.   By retaining the services of Papaya Media, Haven Health gained access to proprietary and confidential information. Unbeknownst to Papaya Media, Haven Health was not interested in paying for these services; it instead sought to gain access to Papaya Media's programs, replicate them, and use them as its own.

7.   After Papaya Media developed and implemented a digital marketing campaign for Haven Health, the organization suddenly revoked Papaya Media's access to the campaign without warning or cause.

8.   Although Haven Health cut off Papaya Media's control of the digital marketing campaign less than four months after its creation, Haven Health did not cease using the proprietary and confidential method implemented by Papaya Media.

9.   Haven Health has never ceased use of the campaign created by Papaya Media, in violation of the binding contract between the parties.

10. Haven Health continues to use the campaign and the proprietary data that powers it, misappropriating Papaya Media's confidential and proprietary trade secret information.

11. Papaya Media has come to this Court to vindicate its rights and recover damages from Haven Health concerning its misappropriation of trade secret information, violation of the contract terms, fraudulent inducement, and unfair commercial advantage it has gained through its bad acts.

## THE PARTIES

12. Plaintiff Papaya Media is a New York corporation with its principal place of business at 181 Kingfisher Road in Levittown, New York. Papaya Media is a lead-generating company that creates digital marketing campaigns to help its clients target, engage, and convert potential purchasers into paying customers.

13. Upon information and belief, Defendant Haven Health is a Florida limited liability company, with its principal place of business in Palm Springs, Florida. Haven Health owns and operates behavioral and mental health treatment facilities in several states.

## JURISDICTION AND VENUE

14. This court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because this civil action arises under the Defend Trade Secrets Act, 18 U.S.C. § 1831, *et seq*., a law of the United States.

15. This court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum of $75,000, exclusive of costs, and the dispute is between citizens of different states.

16. Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over the remaining claims because they are so related to the federal claim that they form part of the same case or controversy.

17. Pursuant to 28 U.S.C. § 1391(b)(2), venue is proper in this Court because a substantial part of the events or omissions giving rise to the claim occurred in this District, as Haven Health

contracted with Papaya Media who has its principal place of business in this District, and Haven Health transacts and solicits business in this District.

18. Haven Health is subject to the general and specific personal jurisdiction of this Court, because, among other things, it transacts and solicits business in the State of New York, and either committed the acts complained of within this District, or committed acts without this District and reasonably should have expected those acts to have consequences within this District, as further detailed below.

19. Upon information and belief, Kirill Vesselov ("Vesselov") is a member of Haven Health and its Chief Executive Officer. This belief is based on information contained in a memorandum issued by the New York State Office of Addiction Services ("NY OASAS") on December 4, 2024 ("OASAS Memo") and Haven Health's website. A true and correct copy of the OASAS Memo is attached hereto as **Exhibit A.**

20. Upon further information and belief, Vesselov is a citizen and domiciliary of the State of Florida.

21. Upon information and belief, Haven Health openly operates facilities in New Jersey, Florida, Massachusetts, Indiana, Arkansas, and Arizona. The source of this belief is Haven Health's website and the OASAS Memo. Many of these facilities, which are located outside the State of New York, are referred to as "The Haven" or "Haven Detox."

22. Less openly, and upon information and belief, Haven Health operates Never Alone, Inc. ("Never Alone"), an adolescent drug treatment center located in Ulster County, New York, without regulatory approval.

23. The OASAS Memo concerning Never Alone's request to change its ownership from Max E. Mauer to Vesselov states, "It is noted that Kirill Vesselov is [the] owner of Haven Health

Management. The current relationship between Never Alone and Haven Health Management has been unclear to OASAS *as Never Alone is currently listed on the Haven Health Management webpage as a provider*." Ex. A, at 17 (emphasis added).

24. The OASAS Memo further provides, "According to the applicant there will be no changes to the location, services provided, budget, staffing, or policies & procedures because of this application. However, the proposed budget submitted with the application differs significantly from previous budgets in place reported by the OASAS Regional Office. While the applicant reported no changes to staffing, *it was unclear to OASAS regarding the relationship between Haven Health Management and Never Alone employees as many were utilizing Haven Management email addresses, Haven Health Managements webpage referencing services under the name Never Alone in Hurley NY*. And staff self-report to OASAS Regional Office staff . . . ." Ex. A, at 20 (emphasis added).

25. NY OASAS conditionally recommended that the Change in Ownership application concerning Never Alone be approved. One of the contingencies was the "[r]emoval of all reference to Never Alone Inc on the Haven Health Management website." Ex. A, at 20.

26. Never Alone's website still shows other indicia that it is being operated by Haven Health.

27. Several reviews that Never Alone posts on its website concerning its services instead discuss "The Haven." Some reviews even discuss the facility's location in "South Florida." When these individual reviews are "clicked," the user is taken to Google reviews for Haven Health, not Never Alone. Similarly, the Notice of Privacy Practices on Never Alone's website discusses "Haven Detox" and directs inquiries concerning its privacy practices to "Haven Health Management." True and correct copies of screenshots, showing the same, are annexed as **Exhibit B**.

28. The social media links at the bottom of Never Alone's webpage link to The Haven Detox (@havendetoxnow) on Instagram; a YouTube channel for Haven Detox, featuring videos from Haven Health's South Florida, New England and Arkansas facilities; and, the LinkedIn profile for The Haven Detox, in Florida. True and correct copies of screenshots, showing the same, are annexed as **Exhibit C**

29. A video created by Haven Health and posted to its YouTube channel lists "Never Alone" as one of the various "recovery brands" it operates, and this same video touts Haven Health's location in New York. True and correct screenshots from this video located at www.youtube.com/watch?v=xpSCy1KDCl0, at :16 and 2:42 are attached hereto as **Exhibit D.**

30. The New York Secretary of State lists Haven Health's General Counsel as Never Alone's registered agent for service of process, notably at Haven Health's address in Palm Springs, Florida.

31. Further, a portion of the digital advertising services that Haven Health purchased from Papaya Media, and still utilizes today, targets patients in the State of New York, including patients in this District, as well as in Ulster County, New York, where Never Alone is located.

32. Haven Health is conducting business in the State of New York and is advertising that business to New York residents, using a New York-based digital marketing agency.

## FACTS APPLICABLE TO ALL CLAIMS FOR RELIEF

33. Papaya Media is a lead generation company that specializes in digital marketing. Its clients, referred to as advertisers, hire Papaya Media to target consumers who are already searching for the types of goods or services the advertiser provides.

34. Papaya Media produces leads through the creation of targeted digital marketing campaigns, as more fully described below.

**A. Papaya Media's Creation of Targeted Advertising Campaigns**

35. After researching the market for the advertiser or potential advertiser and through extensive trial and error, Papaya Media develops expanded and responsive text advertisements ("Ad Copy").

36. Expanded text advertisements are a longer advertising format that is static, meaning the advertisement stays the same regardless of the search terms used by a consumer.

37. Responsive text advertisements are an adaptable form of advertising that changes based on the search terms used by a potential consumer. For example, headlines in a responsive text advertisement, as well as the descriptions provided in the user's search engine results, may change based on the search terms, search history, and even the device used by the user.

38. Embedded in the Ad Copy, Papaya Media creates positive and negative keywords that Papaya Media has researched and selected.

39. A positive keyword is a word or phrase that an advertiser uses to decide which potential clients receive its advertisements.

40. A negative keyword is a word or phrase that acts as a filter to prevent an advertiser from showing ads to a person who used the negative keyword in their search.

41. Negative keywords help advertisers better target their desired audience.

42. The use of negative keywords is especially desirable when an advertiser is using a "pay-per-click" or "pay-per-call" campaign model. In these types of campaigns, an advertiser pays for each call or click that a digital marketing company has generated for it, regardless of whether that potential customer becomes a paying client of the advertiser.

43. Weeding out people who will never become paying customers saves the advertiser significant money on advertising.

44. As a part of its advertising campaigns, Papaya Media also uses landing pages. A landing page is a standalone webpage where potential customers are provided with general information concerning the services of the advertiser. Typically, a way to contact the provider is supplied on the landing page.

45. When managing a digital media campaign, Papaya Media tracks several data points concerning the impressions and engagement generated for each combination of keywords and piece of Ad Copy.

46. Based on these metrics, Papaya Media modifies the Ad Copy it created and the keywords it uses to better target its desired audience.

47. When managing campaigns, Papaya Media actively adjusts ad bids for the placement of its digital marketing material.  An "ad bid" is the maximum amount of money an advertiser is willing to pay for each click on an advertisement.  These amounts rise and fall based on fluctuating factors such as competition, demand, or relevancy, and thus the goal is to bid the correct amount to prioritize your digital campaign, without overpaying for the market. By actively monitoring and adjusting ad bids, Papaya Media optimizes a customer's return on investment.

**B.  Papaya Media Begins Generating and Monetizing Leads for Drug and Alcohol Rehabilitation Centers in the United States**

48.  In or about 2017, Papaya Media began generating leads for drug and alcohol rehabilitation centers throughout the United States. Papaya Media sold these leads to performance networks, who would then find buyers for these leads, contract call centers to perform calls, and track calls to these leads (the "Independent Campaign").

49. Leads generated from the Independent Campaign were sold "per call," meaning performance networks would pay Papaya Media for each call Papaya Media routed to them, which lasted a certain duration.

50. The Independent Campaign was extremely successful and at its peak generated approximately $1,648 in profit a day for Papaya Media.

**C. Papaya Media Begins Working with LCN**

51. In or about April 2022, using the experience and know-how it gained from the Independent Campaign, Papaya Media created and managed a Microsoft Ads (sometimes called "Microsoft Bing") digital advertising campaign for drug and alcohol rehabilitation centers in the United States.

52. On or about March 24, 2022, Papaya Media began working with the performance network Live Calls Network, LLC ("LCN") to steer calls Papaya Media generated to LCN. LCN would then route these steered calls to various advertisers it worked with in the drug and alcohol rehabilitation center industry.

53. LCN acted as an agent to its clients, drug and alcohol rehabilitation centers, to purchase leads from Papaya Media in the form of telephone calls from potential patients or their families (the "LCN Campaign").

54. For each call sent to LCN pursuant to the LCN Campaign, LCN would pay Papaya Media $50 per call, provided the calls lasted at least 30 seconds.

55. The LCN Campaign consisted of the selection of positive and negative keywords, the incorporation of those keywords into Ad Copy, data analytics, and the creation of landing pages that directed consumers to a telephone number where they would speak to an addiction treatment and rehabilitation service provider.

56. The LCN Campaign used over 130,000 unique combinations of positive and negative keywords and/or geographic and keyword advertisement groupings. Specifically, the LCN Campaign had 121,152 positive keywords, 677 negative keywords, 4,168 responsive ads, and

13,174 expanded text ads. These keywords and combinations were created based on Papaya Media's years of experience.

57. Many of those geographic groupings targeted residents of the State of New York.

58. The names of several towns located in this District (Nassau, Queens, and Suffolk Counties) were used as terms in geographic ad groupings.

59. Kingston, the only city in Ulster County, New York, was also a term used in these geographic ad groupings. This is notable because Never Alone is in Ulster County, New York.

60. The LCN Campaign generated approximately 45 qualified leads a day.  The LCN Campaign ran for approximately one year.

**D.  Haven Health Contracts with Papaya Media for Digital Marketing Services, through its Exclusive Agent LCN**

61. In or about April 2023, LCN approached Papaya Media on behalf of a valued client, Haven Health, to conduct a digital marketing campaign that replicated the LCN Campaign (the "Haven Health Campaign").

62. Each of the parties' obligations concerning the Haven Health Campaign are detailed in the "Publisher Agreement Rehab Microsoft Bing PPC Management Pay Per Call Pricing Model," dated April 18, 2023 (the "Publisher Agreement"), a true and correct copy is annexed hereto as **Exhibit E.**

63. The Publisher Agreement provides that Papaya Media will be paid $50 for each call it generates and routes pursuant to the Haven Health campaign, if that call lasts at least 30 seconds. Ex. E, at 2 (price per transfer).

64. While "Advertiser" is not defined in the Publisher Agreement, Haven Health's identity as the "Advertiser" was disclosed to Papaya Media.

65. Pursuant to the Publisher Agreement, LCN "will exclusively represent the Advertiser [Haven Health] to buy services from the Publisher [Papaya Media]. All communications related to the Advertiser [Haven Health] will be done solely between and through LCN and not directly between Advertiser [Haven Health] and Publisher [Papaya Media]. . . ." Ex. E, at 3 (Miscellaneous Consideration).

66. At all relevant times, LCN acted as Haven Health's agent regarding the Publisher Agreement.

67. The Publisher Agreement further states, in relevant part:

> This is a 1 year Microsoft Bing PPC Management agreement paid on a call buffer pricing structure. . . . LCN has a long standing relationship with the Advertiser associated with this agreement [Haven Health] that has been in place since early 2020. This is a proprietary relationship that LCN maintains and is a highly valuable and consistent revenue generating customer to LCN. Publisher [Papaya Media] will manage, optimize and grow inbound call volume through the Microsoft Bing platform . . . . The Publisher [Papaya Media] will share account login details with the Advertiser [Heaven Health] to review their account setup. The Advertiser [Haven Health] will share their LegitScript certification # with the Publisher [Papaya Media] and assist them to associate their Microsoft Bing account with the Advertisers [Haven Health's] account (LegitScript and Bing if applicable) so that the Publisher [Papaya Media] account is approved to run ads.
> . . . .
>
> If there is a cancellation of the agreement by the Advertiser [Haven Health] prior to the 12 month contract term expiring which is not due to Publisher [Papaya Media] cause, breach or low campaign performance / low conversion then a penalty of $45,000 will apply. The cancellation penalty will be prorated by the number of months the campaign has been running. For example, if the campaign has been running for exactly 6 months then the cancellation fee will be 50% of the $45,500 which would equal $22,500. LCN must receive the cancellation fee funds from the Advertiser [Haven Health] to pay the Publisher [Papaya Media] and the fee will be paid within 10 days of the Advertiser [Haven Health] cancellation notice date . . . .

*See* Ex. E, at 2-3 (Miscellaneous Consideration).

68. The Publisher Agreement further codifies the conditions of early Termination stating,

> Early Termination of 12 month agreement. If there is a cancellation of the agreement by the Advertiser prior to the 12 month contract term expiring which is not due to Publisher

cause, breach or low campaign performance / low conversion then a penalty of $45,000 will apply. The cancellation penalty will be prorated by the number of months the campaign has been running. For example, if the campaign has been running for exactly 6 months then the cancellation fee will be 50% of the $45,500 which would equal $22,500. LCN must receive the cancellation fee funds from the Advertiser to pay the Publisher and the fee will be paid within 10 days of the Advertiser cancellation notice date.
*See* Ex. E, at 4 (Section 3(c)) ("Early Termination Clause").

69. The Publisher Agreement provides the following with respect to confidentiality, "The entire agreement between the parties is Mutually Confidential. Any and all business dealings, partnerships, programs, verbal or written communications, must be considered Confidential and may not be disclosed unless written permission is given by both parties." *See* Ex. E, at 6, (Section 9(c)).

70. The Publisher Agreement further provides the following, "Neither Publisher [Papaya Media] nor LCN will attempt to or circumvent the other and will not solicit any of the other's employees, contractors, agents, or representatives." *See* Ex. E, at 6 (Section 9(d)).

71. Pursuant to the Publishing Agreement, "The Advertiser [Haven Health] agrees not to use or duplicate Publishers Microsoft Bing data in any way to recreate pay per click or pay per call campaigns on Microsoft Bing, Google or any other digital marketing platform." *See* Ex. E, at 3 (Miscellaneous Consideration).

**E. The Haven Health Campaign**

72. On April 24, 2023, Papaya Media was invited as a user to Haven Health's Microsoft Ads account, understanding that Papaya Media was going to upload, implement, and manage the Haven Health Campaign.

73. Papaya Media was granted access to Haven Health's Microsoft Ads account, and implemented a replicated LCN Campaign.

74. Among other things, the Haven Health Campaign used the same keywords and Ad Copy as the LCN Campaign. The campaign uploaded by Papaya Media to Haven Health included amounts approximating the 121,152 positive keywords, 677 negative keywords, and 4,168 responsive ads of the LCN Campaign. The Haven Health Campaign had an identical structure to the LCN Campaign.

75. The only element of the keyword database that was not added to the Haven Health Campaign was deprecated ad types, or the 13,174 expanded text ads.

76. Thus, the data analytics research, "know-how," and processes developed by Papaya Media in the Independent Campaign and LCN Campaign were used in the Haven Health Campaign.

77. On April 26, 2023, Papaya Media routed its first calls to Haven Health pursuant to the Haven Health Campaign.

78. Incoming calls were initially routed through landing pages, where potential patients would click a box to call Haven Health.

79. Haven Health created the landing pages on their domain, which copied Papaya Media's landing page format and language.

80. Each landing page contained a "tracking code" allowing Papaya Media to verify the number of calls Haven Health reported it received pursuant to the campaign. When the "call" box was clicked on a landing page, the call would receive Papaya Media's tracking number, sent to LCN through their tracking number, and then be routed to Haven Health. This "tracking code" was through a performance management software called CallRail.

81. Papaya Media was paid on a pay-per-call basis, and the rate was the same as the LCN Campaign, $50 per call that lasted over 30 seconds.

82. For the Haven Health Campaign, Haven Health bore the costs of the advertising. Thus, the payments to Papaya Media were the number of qualified calls, at $50 a call, less the daily advertising cost incurred by Haven Health.

83. Until August 2023, LCN, as Haven Health's exclusive agent, paid Papaya Media for calls Papaya Media routed pursuant to the Publishing Agreement.

84. At no time did either Haven Health or LCN inform Papaya Media that the Publishing Agreement was terminated.

85. At no time did either Haven Health or LCN inform Papaya Media that Haven Health was unhappy with the services Papaya Media was providing.

86. At no time did either Haven Health or LCN inform Papaya Media that Papaya Media was breaching its obligations under the Publishing Agreement.

87. On or about August 1, 2023, Haven Health removed Papaya Media's access to Haven Health's Microsoft Ads account.

88. Despite a request to LCN to restore Papaya Media's access, which LCN confirmed was communicated to Haven Health, Papaya Media's access was never restored.

89. The last payment that Papaya Media received from LCN, on behalf of Haven Health, for the Haven Health Campaign was on August 21, 2023, for $946.34. This payment was for services provided from July 17, 2023, through July 23, 2023.

**F. Haven Health's Breach of the Publisher Agreement**

90. Since August 1, 2023, Haven Health continues to run the Haven Health Campaign that Papaya Media created, despite no longer compensating Papaya Media for the same. This is a material breach of the Publisher Agreement.

91. Since August 1, 2023, Haven Health continues to use, without authorization or authority, the Ad Copy, keywords, and underlying data and analytics associated with the Haven Health Campaign, as well as Papaya Media's log in details despite its contractual obligation "not to use or duplicate Publishers Microsoft Bing data in any way to recreate pay per click or pay per call campaigns on Microsoft Bing, Google or any other digital marketing platform." *See* Ex. E, at 3. These uses are material breaches of the Publisher Agreement.

92. The current advertising campaign for Haven Health contains the approximate number of keywords in the Haven Health Campaign created by Papaya Media, 121,152 positive keywords, 677 negative keywords, and 4,168 responsive ads.

93. Further, the CallRail tracking code, used by Papaya Media to track the calls its digital marketing campaign garnered for Haven Health, is still embedded in Haven Health's digital marketing to this day.

94. The landing pages that Haven Health currently uses contain the same tracking code that Papaya Media placed in the landing pages it created for the Haven Health Campaign. These landing pages continue to be used without Papaya Media's consent or authorization. This use is a material breach of the Publisher Agreement.

**G. Papaya Media's Trade Secrets**

95. Over the course of many years, Papaya Media developed, refined, and invested in the creation of a highly successful pay-per-call campaign model for drug and alcohol rehabilitation centers located in the United States.

96. Papaya Media created this campaign model by investing a significant amount of time and money in data analytics and research concerning the selection of positive and negative keywords, as well as client engagement with landing pages, for drug and alcohol rehabilitation centers.

97. The final advertising campaign consists of over 130,000 unique combinations of positive and negative keywords and/or geographic and keyword advertisement groupings.

98. Papaya Media's "know-how" and the processes that it used to develop this model, as well as its keyword selection, are proprietary, very difficult to replicate, and not readily ascertainable to the public (collectively, "Trade Secrets").

99. Papaya Media's Trade Secrets provide it with a significant advantage over others in the digital advertising industry.

100.    The Trade Secrets are extremely valuable to Papaya Media. Its ability to sell pay-per-call campaigns to drug and alcohol rehabilitation centers depends on others not having access to this information.

101.    Until the Haven Health Campaign, Papaya Media's Trade Secrets were not known to anyone outside of Papaya Media. Until that time, the only person with knowledge and access to the Trade Secrets was Papaya Media's founder and only employee. The Trade Secrets were password protected and limited to Papaya Media's sole employee.

102.    In the usual course, Papaya Media's customers do not gain access to the Trade Secrets.

103.    The Haven Health Campaign was the first time Papaya Media had to duplicate its Trade Secrets to a customer's Microsoft Ads account. This was due to the change in certification requirements for medical provider advertisers.

104.    Papaya Media conditioned, and Haven Health agreed, "not to use or duplicate Publishers Microsoft Bing data in any way to recreate pay per click or pay per call campaigns on Microsoft Bing, Google or any other digital marketing platform." *See* Ex. E, at 3 (Miscellaneous Consideration).

105.     Upon information and belief, Haven Health took advantage of this aberration of Papaya Media's policy to gain greater access to the Trade Secrets, despite the contractual terms that protected their misappropriation.

106.     Haven Health continues to use the Trade Secrets to advertise its services to customers throughout the United States, including in New York State, without compensation to Papaya Media.

107.     Haven Health has used the Trade Secrets without authorization since August 2023, when Haven Health removed Papaya Media from its Microsoft Ads account.

108.     Haven Health intentionally and maliciously stole Papaya Media's Trade Secrets and appropriated the proprietary information generated by Papaya Media to generate business.

**H.  Haven Health's Fraud in Inducing the Publisher Agreement**

109.     It is now clear that Haven Health never intended to fully remit payment for the services provided by Papaya Media, and in fact contracted with Papaya Media for the purpose of gaining its Trade Secrets.

110.     This intent is not only shown by Haven Health's abrupt discontinuation of the Publisher Agreement without notice or breach by Papaya Media, but also by the statements of an executive of Haven Health.

111.     On May 17, 2023, the Chief Marketing Officer at Haven Health, Mike Hulick, participated in a public webinar discussing "How to Drive Growth and Efficiency in Healthcare." A recording of this webinar, hosted by Cardinal Digital Marketing, has now been posted to YouTube, https://www.youtube.com/watch?v=6CCWndD6Xx4 (the "Webinar").

112.     In the Webinar, Mr. Hulick admits that Haven Health hires marketing vendors and directs employees to learn their methods, to later discontinue vendors' services while continuing to use their methods.

113.     Specifically, Mr. Hulick, discussing the use of outside vendors for marketing needs at Haven Health, states:

> If you were to make a list of what you are good at internally, ideally, you want that list to be really long. But, there are cases, knowing what you're not good at. **When you need outside help**, *we try and view those as learning opportunities*. So when we do have to contract an outside agency, I usually assign one or two people to it—dealing with [the outside agency]—and say, ***"Learn everything you can. We're not paying for the job, we're paying for your education. Learn everything you can about how they're doing it, and then let's bring it in-house so we don't have to do this again."***

114.     Mr. Hulick's statements portray that at the time of contracting with outside vendors, Haven Health does not intend to fulfill its obligations under the contract, and instead uses vendors to gain access to proprietary knowledge to then use that knowledge without payment.

115.     This video was posted only one month after Haven Health contracted with Papaya Media, and upon information and belief, this was Haven Health's business practice at the time it entered into the Publisher Agreement.

## FIRST CLAIM FOR RELIEF
### Violation of the Defend Trade Secrets Act (18 U.S.C. § 1831, *et seq.*)

116.     Papaya Media realleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

117.     Papaya Media developed, owns, and possesses the Trade Secrets, as defined above.

118.     Papaya Media derives independent economic value from the secrecy of its Trade Secrets.

119.    Specifically, Papaya Media's Trade Secrets are what make its advertising campaigns effective, helping reach the correct target consumer, a person or family member of someone seeking substance abuse treatment, in the most efficient manner.

120.    Papaya Media has taken specific and reasonable steps to keep its Trade Secrets confidential and proprietary from its competitors, vendors, and customers. Specifically contracting to maintain the confidentiality of Trade Secrets, including non-disclosure provisions and restrictive covenants, password-protecting the database, and limiting access to only Papaya Media personnel on a need-to-know basis, and as policy not sharing the Trade Secrets with customers.

121.    Papaya Media's Trade Secrets are used in interstate commerce.

122.    Papaya Media created the Haven Health Campaign with the Trade Secrets and managed the campaign through Haven Health's Microsoft Ads account, until Haven Health removed Papaya Media's access in August 2023. Haven Health continued to use this campaign, utilizing the Trade Secrets, without Papaya Media's authorization or compensation to Papaya Media.

123.    Haven Health acquired the Trade Secrets through improper means by breaching its contractual obligations to keep the information confidential and not use or duplicate Papaya Media's Microsoft Bing data in any way to recreate the Haven Health Campaign.

124.    Haven Health then used the Trade Secrets to continue to run the Haven Health Campaign without Papaya Media's consent. From August 1, 2023, to present, Haven Health used the Haven Health Campaign and Trade Secrets without payment to Papaya Media and without Papaya Media's knowledge.

125.    Haven Health knew or had reason to know that the misappropriation was improper, given the contractual provisions not to duplicate or replicate the Trade Secrets, and the statements

of Haven Health's executive that they sought to learn the methods of outside vendors for the purpose of bringing that vendor's knowledge "in house."

126.    Haven Health misappropriated Papaya Media's Trade Secrets.

127.    As a result, Papaya Media is entitled to damages for actual loss and unjust enrichment caused by the misappropriation of its Trade Secrets.

128.    Because Papaya Media's Trade Secrets were willfully and maliciously misappropriated, Papaya Media is entitled to exemplary damages amounting to twice the amount of damages for actual loss, unjust enrichment,  and reasonable attorneys' fees and costs.

**SECOND CLAIM FOR RELIEF**
**Injunctive Relief under the DTSA (18 U.S.C. § 1836, *et seq.*)**

129.    Papaya Media realleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

130.    Papaya Media operates its business in interstate commerce.

131.    The Trade Secrets misappropriated by Haven Health are related to, and intended for use in interstate commerce, as Haven Health has continued to use the Haven Health Campaign to digitally market its business.

132.    As set forth above, Haven Health improperly acquired Papaya Media's Trade Secrets.

133.    As set forth above, Papaya Media has taken reasonable measures to keep such information secret by, among other things, limiting the release of highly sensitive information in the Publisher Agreement, password-protecting the database, limiting access to the only Papaya Media personnel on a need-to-know basis, and as a regular policy not sharing the Trade Secrets with customers.

134.    The Trade Secrets, namely Papaya Media's "know-how" and the processes that it used to develop this model, as well as its keyword selection and database, qualify as "trade secrets" under the DTSA, as defined in 18 U.S.C. § 1839(3).

135.    The Trade Secrets misappropriated by Haven Health include trade secrets which required substantial resources, time, and investment by Papaya Media to create, and/or develop, and derive independent economic value from not being generally known to, or readily ascertainable by, those who can obtain economic value from use of this information, such as Papaya Media's competitors.

136.    Haven Health's misappropriation of Papaya Media's Trade Secrets has caused it to suffer harm, including but not limited to loss of reputation and customer goodwill, loss of income directly from Haven Health, and loss of the confidentiality of and investment in its trade secrets.

137.    This harm cannot be adequately remedied at law and requires permanent injunctive relief. Papaya Media will suffer irreparable and imminent harm in the absence of a permanent injunction.

138.    This imminent injury is neither remote nor speculative because Papaya Media has already been harmed by Haven Health's misappropriation and use of the Trade Secrets.

139.    Haven Health will not suffer harm from the rightful return of Papaya Media's proprietary information and trade secrets, and will not be prevented from conducting its ordinary business.

140.    Haven Health will merely be prevented from continuing to gain an unfair and unlawful advantage at Papaya Media's expense.

141.    The ongoing, continuing, and future harm to Papaya Media cannot be adequately remedied at law and requires permanent injunctive relief.

142.    The public interest would not be harmed by the issuance of an injunction preventing Haven Health from misappropriating Papaya Media's Trade Secrets.

143.    Accordingly, Papaya Media is entitled to an injunction, pursuant to 18 U.S.C. 1836(b)(3)(A), enjoining Haven Health from continuing to use the Trade Secrets, to prevent continued actual and threatened misappropriation of the Trade Secrets, requiring affirmative actions to be taken by Haven Health to protect the Trade Secrets, requiring Haven Health to return and/or destroy the trade secrets improperly accessed and retained by Haven Health, and payment of a reasonable royalty for the period Haven Health has used the Trade Secrets.

### THIRD CLAIM FOR RELIEF
**Violation of the Maryland Uniform Trade Secrets Act**
**(Md. Com. Law §§ 11-1201-11-1209)**

144.    Papaya Media realleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

145.    Papaya Media owns and possesses the Trade Secrets, consisting of the "know-how" and the processes that it used to develop its advertising campaign model, as well as its keyword selection, consisting of over 130,000 unique combinations of positive and negative keywords and/or geographic and keyword advertisement groupings.

146.    Papaya Media's Trade Secrets are not known outside of its business.

147.    Papaya Media takes reasonable steps to protect its Trade Secrets. This includes contractually prohibiting its Advertisers from using the advertising campaigns in any way, or recreating the pay-per-click or pay-per-call campaigns on any digital marketing platform, explicitly including Microsoft Ads/Bing. *See* Ex. E, at 3. The Trade Secrets were also password-protected, and in the usual course, only accessed by the sole Papaya Media personnel on a need-to-know basis.

148.     The Trade Secrets were developed and refined over the course of many years using Papaya Media's professional effort and expense.

149.     The Trade Secrets derive independent economic value from not being generally known to, and not being readily ascertainable by, proper means. The Trade Secrets represent years of Papaya Media's experience and are why Papaya Media's digital marketing campaigns have high conversion rates.

150.     At all times relevant hereto, Papaya Media derived independent economic value from the confidentiality and secrecy of the Trade Secrets that were misappropriated by Haven Health.

151.     The Trade Secrets are extremely difficult for a competitor to replicate without inside information.

152.     Haven Health obtained, has used, and continues to use, the Trade Secrets in connection with interstate commerce after acquiring them through improper means by breaching its contractual obligations to keep the information confidential and not use or duplicate Papaya Media's Microsoft Bing data in any way to recreate the Haven Health Campaign.  *See* Ex. E, at 3.

153.     Haven Health, either directly or through the actions of others, willfully and maliciously misappropriated Papaya Media's Trade Secrets.

154.     Haven Health knew or had reason to know that the misappropriation was improper, given the contractual provisions not to duplicate or replicate the Trade Secrets, and the statements of Haven Health's executive that they sought to learn the methods of outside vendors for the purpose of bringing that vendor's knowledge "in house."

155.     Haven Health has derived and/or obtained economic value from its improper and unauthorized use of Papaya Media's confidential, proprietary, and/or trade secret information.

156.     As a direct and proximate result of Haven Health's wrongful misappropriation of the Trade Secrets, Papaya Media has suffered damages in an amount to be proven at trial.

157.     By reason of the foregoing, Papaya Media has been damaged and is entitled to punitive damages in an amount to be determined at trial.

## FOURTH CLAIM FOR RELIEF
### Breach of the Publisher Agreement

158.     Papaya Media realleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

159.     The Publisher Agreement constituted a valid and enforceable agreement between Papaya Media and Haven Health, through Haven Health's agent LCN.

160.     Haven Health was a disclosed principal of the Publisher Agreement, with LCN acting as the agent.

161.     Haven Health breached Section 9(c) of the Publisher Agreement by disclosing and appropriating Papaya Media's confidential information.

162.     By use of Papaya Media's Trade Secrets, Haven Health has breached the "Miscellaneous Consideration" by duplicating/recreating the Haven Health Campaign.

163.     Haven Health breached Section 9(d) of the Publisher Agreement by using the Trade Secrets without authority or authorization to circumvent Papaya Media's services.

164.     Each of these breaches, standing alone, constitutes a material and adverse breach of the Publisher Agreement.

165.     Papaya Media has fulfilled its obligations under the Publisher Agreement and has not undertaken any material breaches of the Publisher Agreement.

166.     The Publisher Agreement is subject to an early cancellation fee under the Early Cancellation Clause. If cancellation occurs prior to the 12-month contract term, absent fault from

Papaya Media, a prorated fee of $45,000 shall apply. Haven Health terminated Papaya Media's access to the Microsoft Ads account and breached the Publisher Agreement on August 1, 2023. The 12-month term, initiated on April 18, 2023, still had 37 weeks remaining in at the time of Haven Health's material breaches.

167.    Pursuant to the Early Termination Clause, Papaya Media is due a prorated cancellation fee of $32,020.

168.    Papaya Media is further entitled to compensation for Haven Health's continued use of the Haven Health Campaign from August 2023 to present without compensation to Papaya Media in an amount to be determined at trial.

169.    Papaya Media developed the Haven Health Campaign and was being compensated on a per-call or per-click basis. Haven Health continues to use the Haven Health Campaign in breach of the Publisher Agreement, but without the due compensation to Papaya Media. Accordingly, Papaya Media would have received compensation for the calls and clicks the Haven Health Campaign generates, but for Haven Health's material breaches of the Publisher Agreement.

170.    By reason of Haven Health's breaches, Papaya Media was damaged as a result of Haven Health's breaches of contract.

**FIFTH CLAIM FOR RELIEF**
**Quantum Meruit**
**(In the Alternative to Breach of Contract)**

171.    Papaya Media realleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

172.    In the event the Court finds that no contract exists between the parties, Papaya Media is entitled to recover in *quantum meruit*.

173.    From April 18, 2023, to August 1, 2023, Papaya Media provided services in good faith to Haven Health via the Haven Health Campaign.

174.    The Haven Health Campaign digitally marketed and promoted Haven Health's services and generated leads for customers who would be interested in Haven Health's services as a substance abuse treatment center. The Haven Health Campaign was designed and implemented by Papaya Media for the benefit of Haven Health.

175.    The services were provided at Haven Health's behest, and Haven Health knowingly and voluntarily accepted the services that Papaya Media provided.

176.    Acting as principal to agent LCN, Haven Health contacted Papaya Media to utilize Papaya Media's expertise in digital marketing campaigns for substance abuse treatment centers.

177.    Haven Health knowingly and voluntarily accepted Papaya Media's services, allowing Papaya Media to manage its marketing via Haven Health's Microsoft Ads account.

178.    Haven Health procured Papaya Media's services by fraud, as Haven Health intended to usurp Papaya Media's Trade Secrets and "know-how" of running a tailored digital marketing plan, and cease payment to Papaya Media.

179.    Haven Health was aware and knew that Papaya Media was not providing these services gratuitously.

180.    Haven Health knew that Papaya Media reasonably expected to be compensated for the services provided for the duration of Haven Health's use of the Haven Health Campaign.

181.    Haven Health indeed remitted payment for less than four months, prior to blocking Papaya Media's access to the Microsoft Ads account.

182.    Haven Health has continued to use the Haven Health Campaign, evidenced by the unique attributes of Papaya Media's work are still being used in current marketing campaigns.

183.     Haven Health has now used the Haven Health Campaign, without compensation to Papaya Media, for 20 months, from August 1, 2023, to present.

184.     Haven Health has retained the benefit of the Haven Health Campaign, but has not fully paid Papaya Media for the reasonable value of services provided.

185.     The reasonable value of services provided by Papaya Media is at least $1,462,500 as evidenced by the $50 per qualified call payment, and the average call volume of 45 qualified calls a day, or $2,250 in revenue a day, every day, since August 1, 2023.

186.     As a result of Haven Health's failure to pay Papaya Media for the reasonable value of the services, Papaya Media has been damaged in an amount to be determined at trial, but no less than $1,462,500.

**SIXTH CLAIM FOR RELIEF**
**Unjust Enrichment**
**(In Alternative to Breach of Contract)**

187.     Papaya Media realleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

188.     In the event the Court finds that no contract exists between the parties, Papaya Media is entitled to recover as Haven Health has been unjustly enriched as a result of the use of the Haven Health Campaign.

189.     From April 18, 2023, to August 1, 2023, Papaya Media provided services in good faith to Haven Health via the Haven Health Campaign.

190.     The Haven Health Campaign digitally marketed and promoted Haven Health's services and generated leads for customers who would be interested in Haven Health's services as a substance abuse treatment center. The Haven Health Campaign was designed and implemented by Papaya Media for the benefit of Haven Health.

191.    Papaya Media conferred a benefit upon Haven Health, namely providing the Haven Health Campaign, created with Papaya Media's Trade Secrets, which provided advertising services to Haven Health, resulting in customers for Haven Health's business.

192.    The services were provided at Haven Health's behest, and Haven Health knowingly and voluntarily accepted the services that Papaya Media provided, appreciating their benefit.

193.    This appreciation was evidenced by Haven Health's payment of Papaya Media for these services from April 18, 2023 to August 1, 2023.

194.    Acting as principal to agent LCN, Haven Health contacted Papaya Media to utilize Papaya Media's expertise in digital marketing campaigns for substance abuse treatment centers.

195.    Haven Health knowingly and voluntarily accepted Papaya Media's services, allowing Papaya Media to manage its marketing via Haven Health's Microsoft Ads account.

196.    Haven Health procured Papaya Media's services by fraud, as Haven Health intended to usurp Papaya Media's Trade Secrets and "know-how" of running a tailored digital marketing plan, and cease payment to Papaya Media.

197.    Haven Health knew that Papaya Media reasonably expected to be compensated for the services provided for the duration of Haven Health's use of the Haven Health Campaign.

198.    Haven Health indeed remitted payment for less than four months, prior to blocking Papaya Media's access to the Microsoft Ads account.

199.    Haven Health has continued to use the Haven Health Campaign, evidenced by the unique attributes of Papaya Media's work are still being used in current marketing campaigns.

200.    Haven Health has retained the benefit of the Haven Health Campaign, without compensation to Papaya Media, for 20 months, from August 1, 2023, to present.

201.    Haven Health has retained the benefit of the Haven Health Campaign, but has not fully paid Papaya Media for the reasonable value of services provided.

202.    The reasonable value of services provided by Papaya Media is at least $1,462,500 as evidenced by the $50 per qualified call payment, and the average call volume of 45 qualified calls a day, or $2,250 in revenue a day, every day, since August 1, 2023.

203.    As a result of Haven Health's failure to pay Papaya Media for the reasonable value of the services, Papaya Media has been damaged in an amount to be determined at trial, but no less than $1,462,500.

## SEVENTH CLAIM FOR RELIEF
### Fraudulent Inducement

204.    Papaya Media realleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

205.    Haven Health knowingly and intentionally made materially false representations to Papaya Media, through its agent LCN, that it would keep the Trade Secrets confidential, that it would properly compensate Papaya for use of the Haven Health Campaign developed with the Trade Secrets, and that it would not duplicate or recreate the Haven Health Campaign.

206.    At the time Haven Health entered the Publisher Agreement, it had no intention to fulfill the obligations it agreed to, because it had a present intention to gain access to Papaya Media's Trade Secrets, to learn how to leverage those Trade Secrets, and then cast-off Papaya Media prior to the term of the contract, without even paying the early termination fee.

207.    As evident by the statement of Haven Health's own marketing executive, the short period between gaining access to the Trade Secrets, denying Papaya Media's access to the campaign it created, and the failure to provide any reason for the termination of Papaya Media, Haven Health made the Publisher Agreement with the purpose to defraud Papaya Media.

208.     Haven Health knew that Papaya Media would not enter the Publishing Agreement without these material representations and considerations.

209.     Papaya Media was in fact deceived by Haven Health's misrepresentation, as it had no reason to believe that Haven Health would not fulfill the Publisher Agreement, would misappropriate the Trade Secrets, would use the Trade Secrets without authorization, or would continue to use the Haven Health campaign without appropriate compensation.

210.     Papaya Media reasonably and justifiably relied on Haven Health's misrepresentation to its detriment. Had Papaya Media known that Haven Health intended to fulfill its obligations, Papaya Media would not have entered into the Publisher Agreement.

211.     As a result of Haven Health's actions, Papaya Media sustained substantial economic losses, including but not limited to $1,462,500 in lost profits, among other damages.

## EIGHTH CLAIM FOR RELIEF
### Unfair Competition

212.     Papaya Media realleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

213.     Haven Health has misappropriated Papaya Media's labor, skills, expenditures, and goodwill and displayed egregious bad faith in doing so.

214.     Haven Health induced Papaya Media to create the Haven Health Campaign, using the Trade Secrets, to then block Papaya Media's access to its own campaign, misappropriate the Trade Secrets for the benefit of Haven Health, and ostensibly use Papaya Media's service without payment.

215.     Haven Health has used the Trade Secrets for its own gain, generating marketing leads, new customers, and significant earnings.

216.     Haven Health misappropriated a commercial advantage that belonged exclusively to Papaya Media.

217.     Haven Health and Papaya Media have a valid agreement wherein Haven Health agreed to refrain from duplicating/replicating the Haven Health Campaign, and from using the Trade Secrets, but Haven Health has openly done so.

218.     Haven Health has used deceit, fraud, and/or deception to gain a commercial advantage that belonged to Papaya Media.

219.     As a direct and proximate result of Haven Health's breaches of the Publisher Agreement and use of the Trade Secrets, Papaya has suffered substantial economic damages in an amount to be proven at trial, not less than $1,462,500.

## REQUEST FOR A JURY TRIAL

220.     Papaya Media respectfully requests a trial by jury for all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Papaya Media Corp. prays for the entry of judgment against Defendant Haven Health Management, LLC as follows:

a.   The entry of judgment in favor of Papaya Media and against Haven Health on the First Claim for Relief, finding that Defendants misappropriated Papaya Media's trade secrets in violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq*.;

b.   The entry of a permanent injunction in favor of Papaya Media and against Haven Health,  enjoining Haven Health from continuing to use the Trade Secrets, to prevent continued actual and threatened misappropriation of the Trade Secrets, requiring affirmative actions to be taken by Haven Health to protect the Trade Secrets, requiring Haven Health to return and/or destroy the trade secrets improperly accessed and

retained by Haven Health, and payment of a reasonable royalty for the period Haven Health has used the Trade Secret, as prescribed by the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq*;

c. The entry of judgment in favor of Papaya Media and against Haven Health on the Third Claim for Relief, finding that Haven Health misappropriated Papaya Media's trade secrets in violation of the Maryland Uniform Trade Secrets Act, Md. Com. Law §§ 11-1201−11-1209;

d. The entry of judgment in favor of Papaya Media and against Haven Health on the Fourth Claim for Relief, finding that Haven Health breached the Publisher Agreement;

e. In the alternative to the Fourth Claim for Relief, an entry of judgment in favor of Papaya Media and against Haven Health on the Fifth Claim for Relief, finding that Papaya Media is entitled to recover from Haven Health the reasonable value of its services under *quantum meruit*;

f. In the alternative to the Fourth Claim for Relief, an entry of judgment in favor of Papaya Media and against Haven Health on the Sixth Claim for Relief, finding that Haven Health was unjustly enriched;

g. The entry of judgment in favor of Papaya Media and against Haven Health on the Seventh Claim for Relief, finding that Haven Health fraudulently induced Papaya Media to enter into the Publisher Agreement;

h. The entry of judgment in favor of Papaya Media and against Haven Health on the Eighth Claim for Relief, finding that Haven Health misappropriated a commercial advantage belonging to Papaya Media in violation of Maryland Common Law;

i.  That the Court grant injunctive relief, in favor of Papaya Media, requiring Haven Health to cease all use of or reliance upon, in any manner, any and all confidential, proprietary, and/or trade secret information, including but not limited to in connection with the business of Papaya Media;

j.  Compensatory and consequential damages to Papaya Media in an amount to be proven at trial on all causes of action, including but not limited to lost profits, disgorgement of Haven Health's profits, and any other damages lawfully available for lost sales or business opportunities during the period in which Haven Health misappropriated Papaya Media's trade secrets and/or were otherwise unjustly enriched due to their wrongful acts as alleged herein;

k.  Punitive and exemplary damages in an amount to be determined at trial in this matter;

l.  Interest, costs, and attorneys' fees;

m.  Any such other relief that this Court deems appropriate, just, and proper.

Dated: May 16, 2025
       Brooklyn, NY

Respectfully submitted,

**LEWIS & LIN, LLC**

By:
Brett E. Lewis
Nicole Haff
Rachel Ann Niedzwiadek
77 Sands Street, 6th Floor
Brooklyn, NY 11201
david@iLawco.com
Tel: (718) 243-9323
Fax: (718) 243-9326
*Attorneys for Plaintiff Papaya Media, Corp.*