**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

-------------------------------------------------------- x

PAPAYA MEDIA CORP.,

Plaintiff,

- against -

HAVEN HEALTH MANAGEMENT, LLC,

Defendant.

-------------------------------------------------------- x

HAVEN HEALTH MANAGEMENT, LLC,

Defendant/Third-Party Plaintiff,

- against -

LIVE CALLS NETWORK, LLC,

Third-Party Defendant.

-------------------------------------------------------- x

Case No. 2:25-cv-02752 (JMA) (LGD)

**THIRD-PARTY COMPLAINT**

**JURY TRIAL DEMANDED**

Defendant and Third-Party Plaintiff Haven Health Management, LLC ("Haven"), by and through its undersigned counsel, Armstrong Teasdale LLP, for its Third-Party Complaint against Third-Party Defendant Live Calls Network, LLC ("LCN") pursuant to Rule 14(a) of the Federal Rules of Civil Procedure, alleges as follows:

## PRELIMINARY STATEMENT AND RESERVATION OF RIGHTS

1. This is a third-party action arising out of the claims asserted against Haven by Plaintiff Papaya Media Corp. ("Papaya") in the above-captioned action (the "Underlying Action"). Papaya alleges that LCN — a marketing vendor from which Haven purchased inbound telephone calls — contracted with Papaya in LCN's own name while purportedly acting "on behalf of"

Haven. Papaya now seeks to hold Haven liable for, among other things, the obligations of a contract that Haven never saw, never signed, never authorized, and first learned of when it was sued, and for otherwise allegedly illegally taking possession of Papaya's supposed trade secrets.

2. Haven denies that LCN was ever its agent, denies that it is a party to or bound by any contract between LCN and Papaya, and denies that it is liable to Papaya in any respect. Haven asserts the claims in this Third-Party Complaint because, if and to the extent any of Papaya's allegations were credited, the party responsible for Papaya's alleged injuries — and for the exposure those allegations have created for Haven — is LCN.

3. Nothing in this Third-Party Complaint is or shall be construed as an admission of any allegation of Papaya's Complaint (ECF No. 1) (the "Complaint") or an admission of any liability to Papaya. References in this Third-Party Complaint to the allegations of the Complaint are for context only and do not constitute admissions of their truth.

4. The claims in this Third-Party Complaint are pleaded in the alternative pursuant to Federal Rule of Civil Procedure 8(d)(2) and (d)(3). Where allegations or claims are inconsistent with one another, they are pleaded hypothetically and in the alternative — including claims that arise only if, contrary to Haven's position, the trier of fact were to accept Papaya's allegation that LCN acted as Haven's agent.

5. Haven's claims against LCN arise from LCN's straightforward breach of an agreement and associated duties that exposed Haven to liability it never agreed to bear. Haven retained LCN to provide marketing and lead-generation services pursuant to a written agreement that expressly prohibited LCN from acting as Haven's agent, forming any association with Haven, or engaging subcontractors to directly contract with Haven. Notwithstanding those unambiguous contractual limitations, if the allegations in Papaya's complaint are true, LCN contracted with

Papaya and falsely represented to Papaya that it was doing so as Haven's exclusive agent — a misrepresentation LCN had neither the authority nor the contractual right to make. Haven had never heard of Papaya, never authorized LCN to bind it to any agreement with Papaya, and never had any direct communication or relationship with Papaya. LCN's unauthorized and deceptive conduct has now embroiled Haven in litigation in which Papaya seeks more than, upon information and belief, $6,000,000 in damages for claims arising solely from LCN's actions. Because LCN is directly and solely responsible for the circumstances giving rise to Papaya's claims, Haven is entitled to breach of contract damages, indemnification, and all other available relief against LCN.

**PARTIES**

6. Haven is a limited liability company organized under the laws of the State of Florida with its principal place of business at 1311 E. Atlantic Blvd., Pompano Beach, Florida 33060. Haven's sole member is Kirill Vesselov ("Vesselov"). Vesselov is a citizen of, and domiciled in, Florida**.**

7. Upon information and belief, LCN is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 10319 Westlake Drive, Suite 450, Bethesda, Maryland 20817. The identities and citizenship of LCN's members are not matters of public record; upon information and belief, no member of LCN is a citizen of the same state as any member of Haven. Upon information and belief, at all times relevant to the Complaint and this third-party claim, Stan Burns ("Burns") was the sole member of LCN. Upon information and belief, Burns is a citizen and domiciliary of the State of Maryland.

**JURISDICTION AND VENUE**

8. This Court has supplemental jurisdiction over the claims in this Third-Party Complaint pursuant to 28 U.S.C. § 1367(a) because they are so related to the claims asserted by

Papaya against Haven in the Underlying Action that they form part of the same case or controversy under Article III of the United States Constitution. The limitations of 28 U.S.C. § 1367(b) do not apply because the claims herein are asserted by a defending party as third-party plaintiff under Rule 14(a), not by a plaintiff.

9. In the alternative, this Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a) because the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and, upon information and belief, the dispute is between citizens of different states.

10. This Court has personal jurisdiction over LCN because, among other things, LCN transacts business within the State of New York; LCN solicited, negotiated, and entered into a contract with Papaya, a New York corporation with its principal place of business in this District, under which Papaya performed digital-advertising services from New York; the advertising campaigns at issue targeted consumers in New York, including in this District; and the claims asserted herein arise out of and relate to those New York contacts.

11. Venue over this Third-Party Complaint is proper in this District because this Third-Party Complaint is ancillary to the Underlying Action pending in this District and, independently, pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

## FACTS

### A. The Haven Agreement

12. At all times relevant to this third-party action and the Complaint, Haven managed behavioral and mental health treatment facilities.

13. LCN is engaged in the business of generating and reselling pay-per-call leads, lead-generation services, call transfers, and related marketing services.

14. In or about March 2020, LCN and Haven entered into a written agreement titled "Advertiser Agreement Addiction Pay Per Call 30 seconds buffer," dated March 23, 2020 and executed on March 24, 2020 (the "Haven Agreement"), pursuant to which the "Advertiser," Haven, agreed to purchase from LCN inbound telephone calls from prospective patients seeking addiction-treatment services. A true and accurate copy of the Haven Agreement is attached hereto as Exhibit A.

15. The Haven Agreement was drafted and prepared by LCN.

16. The Haven Agreement identifies the "Advertiser" as "Haven Behavioral Healthcare, LLC."

17. The identification of "Haven Behavioral Healthcare, LLC" as the Advertiser was the product of a mutual mistake. At all relevant times, LCN and Haven intended and understood the Haven Agreement to be between LCN and Haven.

18. Michele Santagata executed the Haven Agreement on behalf of the Advertiser.

19. Consistent with the parties' mutual intent, at all times from March 2020 forward: (a) LCN performed services under the Haven Agreement for Haven's benefit; (b) LCN invoiced Haven for those services; (c) Haven paid LCN's invoices; and (d) LCN and Haven dealt with one another as the contracting parties under the Haven Agreement.

20. Haven Behavioral Healthcare, LLC has never received services under the Haven Agreement, has never been invoiced under the Haven Agreement, and has never paid for services under the Haven Agreement.

21. The Haven Agreement became effective when signed and, by its terms, "shall remain in effect during test and renewal period unless terminated as provided in this Agreement." Ex. A § 3.

22. Upon information and belief, the Haven Agreement was never formally terminated, but in practice, eventually, the parties ceased doing business together as described below.

23. Pursuant to Section 1 of the Haven Agreement, Haven and LCN agreed to agree upon the specific parameters of specific advertising campaigns from time to time in the future. Ex. A § 1.

### B. The Haven Agreement Establishes a Vendor Relationship and Disclaims Any Agency

24. Under Section 2 of the Haven Agreement, Haven agreed to pay LCN for "Billable calls," defined as calls lasting thirty (30) seconds or longer "from an actual person with genuine interest" in the Advertiser's services, and LCN agreed to invoice Haven for such calls. Ex. A § 2.

25. At the time the Haven Agreement was executed, Haven and LCN agreed that LCN would be compensated at the rate of $50 per Billable Call.

26. Section 5 of the Haven Agreement, titled "INDEPENDENT CONTRACTOR," provides in pertinent part:

> The parties to this Agreement intend to create the relationship of independent contractor, and ADVERTISER will not become, by reason of his performance under the terms of this Agreement, an agent or employee of LCN, and no joint enterprise or partnership is intended by this Agreement. **ADVERTISER and LCN agree that they are not in a position to assume any affiliation, association, alliance**, or become a mutual enterprise as it relates to this Agreement. There is no obligation or implied expectation to any extent.

(Ex. A § 5.) (emphasis added.)

27. In Section 6(a) of the Haven Agreement, LCN represented that "LCN generates pay per call services by online and offline advertising, and from in-house activities where there is compliant outbound calling of potential customers."

28. In Section 6(b) of the Haven Agreement, LCN represented that LCN — itself, in its own name — "purchases media from third party publishers and marketing agencies" and "has Agreements with the vendors stating that the vendors adhere to all industry regulations."

29. Together, Sections 5 and 6 of the Haven Agreement establish the structure of the parties' relationship: LCN sells calls to Haven as an independent vendor; to the extent LCN relies on outside publishers or media sources to generate those calls, LCN engages those publishers itself, in its own name and on its own behalf; and neither party is the agent of, or affiliated or allied with, the other.

30. Nothing in the Haven Agreement authorizes LCN to act on Haven's behalf, to enter into contracts in Haven's name or for Haven's account, to bind Haven to obligations owed to third parties, or to make representations to third parties on Haven's behalf.

31. Section 9(a) of the Haven Agreement provides that the agreement "may only be revised and modified with the express written Agreement by both LCN and ADVERTISER," and that "[a]ny modifications to this Agreement must be made via email with replies from a representative of ADVERTISER and LCN."

32. Section 9(c) of the Haven Agreement provides that it "shall constitute the entire Agreement between the parties" and that "[t]he entire agreement between the parties is Mutually Confidential."

33. Section 9(d) of the Haven Agreement prohibits the Advertiser from "directly or indirectly solicit[ing], induc[ing] or encourag[ing] any publisher, partner or affiliate" of LCN "to do business without going through LCN." By design, this structure separated Haven from LCN's publishers and confirmed that LCN's publishers were LCN's own counterparties — not Haven's.

34. Section 7 of the Haven Agreement provides in pertinent part that, "in the absence of reckless or bad faith conduct, or fraud on the part of LCN, LCN'S liability is specifically limited to the compensation paid for pay per call and related services, and in no event shall LCN be liable for any special, indirect, or consequential damages arising out of the performance of the terms of this Agreement."

35. By its plain terms, the limitation of liability in Section 7 of the Haven Agreement does not apply where LCN has engaged in reckless conduct, bad faith conduct, or fraud.

**C. The 2023 Campaign**

36. In or about April 2023, Haven and LCN discussed the parameters of a new advertising campaign through which LCN would sell to Haven inbound calls generated through the Microsoft Bing (Microsoft Advertising) platform (the "Campaign").

37. Haven and LCN agreed upon the parameters of the Campaign, including that Haven would pay LCN $75 per Billable Call.

38. When crafting the Campaign parameters, LCN never provided to Haven the names of any subcontractors or service providers that LCN would rely on to provide the agreed-upon services.

39. Haven and LCN never discussed, and never agreed to create, a principal-agent relationship for purposes of the Campaign or for any other purpose.

40. To the contrary, the operative terms of the parties' relationship — including Section 5 of the Haven Agreement — expressly disclaimed any agency, affiliation, association, alliance, or mutual enterprise between them.

41. Haven did not authorize LCN to engage any publisher, subcontractor, or service provider on Haven's behalf, to enter into any contract in Haven's name or for Haven's account, or

to make any representation to any third party on Haven's behalf, whether in connection with the Campaign or otherwise.

42. The Campaign proceeded in the manner contemplated by the Haven Agreement: LCN delivered calls to Haven, LCN invoiced Haven at the rate of $75 per Billable Call, and Haven paid LCN's invoices.

43. To the extent any third party was granted user access to Haven's Microsoft Advertising account in connection with the Campaign, Haven understood any such third party to be a vendor or subcontractor engaged by LCN, on LCN's own behalf, consistent with LCN's representations in Section 6(b) of the Haven Agreement.

44. At the time the parameters of the Campaign were agreed, Haven had never heard of Papaya.

45. At the time the parameters of the Campaign were agreed, Haven had no relationship with Papaya.

46. At the time the parameters of the Campaign were agreed, Haven had no knowledge of any arrangement or contemplated arrangement between LCN and Papaya.

### D. LCN's Undisclosed Contract with Papaya

47. Upon information and belief, on or about April 17–18, 2023, LCN entered into a written agreement with Papaya titled "Publisher Agreement Rehab Microsoft Bing PPC Management Pay Per Call Pricing Model 30 second buffer" (the "Papaya Contract"). A copy of the Papaya Contract is attached as Exhibit E to the Complaint (ECF No. 1-5).

48. LCN executed the Papaya Contract in its own name, through its Chief Executive Officer and founder, Burns.

49. Haven is not a signatory to the Papaya Contract.

50. The Papaya Contract does not identify Haven by name.

51. Under the Papaya Contract, it is LCN — not the unnamed "Advertiser" — that bears the obligation to pay Papaya: "LCN will pay Publisher at the set rate of $50 per call with a 30 second call buffer," Compl. Ex. E (Miscellaneous Consideration), and "LCN agrees to pay PUBLISHER amounts in accordance with the campaign details & fee schedule included at the top of this agreement . . . ." *Id.* § 2.

52. The Papaya Contract further provides that "[p]ayment to PUBLISHER is contingent on LCN receiving payment from **our client** related to this agreement." *Id.* § 2. (emphasis added.)

53. The Papaya Contract does not refer to the PUBLISHER as LCN's principal.

54. Upon information and belief, LCN thus simultaneously: (a) agreed to pay Papaya $50 per Billable Call under the Papaya Contract, while (b) charging Haven $75 per Billable Call for the very same calls, retaining for itself an undisclosed margin of $25 per call, a markup of fifty percent over LCN's cost.

55. LCN never disclosed to Haven the existence of the Papaya Contract.

56. LCN never disclosed to Haven any of the Papaya Contract's terms.

57. LCN never disclosed to Haven any of LCN's margin under the Papaya Contract.

58. LCN never disclosed to Haven Papaya's identity.

59. LCN never disclosed to Haven Papaya's role in performing Haven's obligations under the Haven Agreement.

60. The Papaya Contract recites that "LCN has a long standing relationship with the Advertiser associated with this agreement that has been in place since early 2020," and describes

that relationship as "a proprietary relationship that LCN maintains" and "a highly valuable and consistent revenue generating customer to LCN." Compl. Ex. E (Miscellaneous Consideration).

61. The Papaya Contract states that "LCN will exclusively represent the Advertiser to buy services from Publisher" and that "[a]ll communications related to the Advertiser will be done solely between and through LCN and not directly between Advertiser and Publisher." *Id.*

62. Haven had no knowledge of these terms at the time the Papaya Contract was executed.

63. LCN was not authorized to "exclusively represent" Haven "to buy services from the Publisher . . . ."

64. LCN's foregoing representations to Papaya were false.

65. LCN never disclosed these representations to Haven.

66. If, in connection with the negotiation and execution of the Papaya Contract, LCN represented to Papaya that LCN was acting as the agent or exclusive representative of Haven and/or that LCN was contracting on behalf of Haven, then such representations were unauthorized. *See* Compl. ¶¶ 61–66.

67. Any such representation made by LCN to Papaya was false.

68. Any such representations made by LCN to Papaya were never disclosed by LCN to Haven.

69. The Papaya Contract contains terms that Papaya now seeks to enforce against Haven, including: (a) a covenant that "[t]he Advertiser agrees not to use or duplicate Publishers Microsoft Bing data in any way to recreate pay per click or pay per call campaigns on Microsoft Bing, Google or any other digital marketing platform," Compl. Ex. E (Miscellaneous Consideration); (b) an early-termination provision under which a prorated penalty of $45,000

applies if the "Advertiser" cancels before the end of a twelve-month term, with "LCN [to] receive the cancellation fee funds from the Advertiser to pay the Publisher," id. § 3(c); and (c) a mutual confidentiality provision, id. § 9(c).

70. Before the commencement of the Underlying Action, Haven had never seen the Papaya Contract. Instead of providing Haven with a final contract between LCN and Papaya, LCN told Haven that LCN was considering working with an unidentified "partner" to source calls for Haven, and outlined terms for the agreement between LCN and the unidentified partner. LCN expressly informed Haven that the terms "ha[d]n't been sent to the publisher" and that LCN would "need to get them to co-approve after you approve."

71. Nonetheless, thereafter, LCN never informed Haven of: (a) the identity of LCN's "partner," (b) whether LCN's "partner" approved the terms of the proposed agreement that LCN outlined to Haven, or (c) whether an agreement between LCN and LCN's "partner" was entered into.

72. Moreover, LCN never requested that Haven sign any agreement with LCN's unidentified "partner."

73. Upon information and belief, the "partner" that LCN referenced to Haven was Papaya.

74. Upon information and belief, the contract that LCN proposed that it would enter into with its "partner" was the Papaya Contract.

75. Upon information and belief, LCN knew at all relevant times that Papaya claimed the keyword data, advertisement copy, and related campaign materials at issue as Papaya's proprietary and confidential information. Among other things, LCN negotiated and signed the Papaya Contract containing the no-duplication and confidentiality provisions described above,

and, upon information and belief, LCN had purchased calls generated by Papaya's advertising campaigns since at least March 2022. *See* Compl. ¶¶ 51–60.

76. LCN never informed Haven that Papaya claimed any materials associated with the Campaign as proprietary, confidential, or trade-secret information.

77. In the Complaint, Papaya alleges that, in connection with the Campaign, Papaya itself uploaded its claimed proprietary campaign materials into Haven's Microsoft Advertising account, and that this structure resulted from changed certification requirements applicable to medical-provider advertisers. *See* Compl. ¶¶ 72–76, 103. Upon information and belief, that structure was proposed, arranged, and coordinated by LCN.

78. Accordingly, taking Papaya's allegations on their own terms, it was LCN that: (a) solicited Papaya's services in order to resell them to LCN's own customer at a fifty-percent markup; (b) held itself out — falsely and without authority — as Haven's agent and exclusive representative; (c) agreed in writing to pay Papaya for the calls; (d) arranged for Papaya's claimed proprietary materials to be placed into Haven's account; and (e) concealed the entire arrangement from Haven.

**E. LCN Requests that Haven Provide "Bryan" with Access to Haven's Bing Account**

79. In or about April 2023, LCN requested that someone named "Bryan" be provided with access to "Bing" for the purpose of generating leads through the Campaign.

80. Haven provided "Bryan" with access to Bing at LCN's request.

81. Upon information and belief, "Bryan" uploaded the Campaign into Haven's servers.

82. When Bryan did so, neither he nor LCN informed Haven that Bryan considered the Campaign materials to be a trade secret or other confidential information.

83. Likewise, neither Bryan nor LCN took any steps to ensure that Haven would not retain, alter, or reuse, or transmit the data that they voluntarily uploaded to Haven's servers.

84. Neither LCN nor Bryan disclosed that Bryan was associated with Papaya.

85. Indeed, Bryan took steps to actively obscure his association with Papaya by communicating solely through e-mail accounts with the addresses "bryan.flores@logventura.com" and bryanfloresrehab@gmail.com.

**F. The Campaign Ends for Low Performance; LCN Stops Paying Papaya**

86. Haven's objective for the Campaign was to increase the volume of qualified callers genuinely interested in purchasing its services, increase the number of individuals purchasing its services, and grow its revenue.

87. The Campaign did not meet those objectives: call volumes and conversions did not materially improve over pre-existing levels.

88. LCN never informed Haven that "Bryan" worked for Papaya, was the principal of Papaya, or that Papaya even existed.

89. In or about July and August 2023, LCN asserted that Haven was not paying its invoices quickly enough and repeatedly requested payment.

90. On or about August 2, 2023, LCN unilaterally terminated the Campaign.

91. Specifically, on August 2, 2023 Mark Muzzini of LCN wrote to Kirill Vesselov, among others, that LCN "ha[sn't] been receiving any responses or updates on the most recent invoices. . . . At this point we have been forced to hard pause the rehab campaign across the board."

92. As a result of LCN's unilateral decision to terminate the Campaign, Haven stopped purchasing calls through LCN.

93. At or about the same time, and as a result of LCN's decision to terminate the Campaign, Haven removed the access to Bing previously granted to "Bryan."

94. Nonetheless, Haven paid all of LCN's outstanding invoices.

95. On August 22, 2023, Mark Muzzini, on behalf of LCN, wrote to Mike Hulick (of Haven Health) "to confirm that we [LCN] did receive payment last Wednesday on the most recent invoice our accounting team sent over," and "Haven is now fully current with LCN."

96. On the same day, August 22, 2023, LCN, through Mark Muzzini, requested that LCN and Haven "restart talks now about payment terms and setting the rehab campaign back live . . . ."

97. Haven declined to enter into new discussions to resume the Campaign or craft new campaigns with LCN after LCN unilaterally terminated the Campaign.

98. LCN continued to reach out to Haven to market advertising services, but Haven declined to enter into additional agreements with LCN.

99. The Campaign was terminated because LCN chose to terminate; Haven did not object because the Campaign did not meet Haven's expectations.

100. Papaya alleges that every payment it received in connection with the Campaign was made by LCN, and that the last such payment was made on August 21, 2023, for services rendered in July 2023. See Compl. ¶¶ 83, 89.

101. Haven had no knowledge of, no involvement in, and no responsibility for LCN's payment or non-payment of Papaya.

102. Upon information and belief, to the extent LCN received payment from Haven for Billable Calls and failed to remit to Papaya amounts LCN owed Papaya with respect to those calls, LCN simply kept for itself monies attributable to Papaya's services.

### G. The Underlying Action

103. On May 16, 2025, Papaya commenced the Underlying Action.

104. Haven was served with the summons and Complaint on or about May 19, 2025.

105. The Complaint asserts eight claims for relief against Haven: (i) violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 et seq. (the "DTSA"); (ii) injunctive relief under the DTSA; (iii) violation of the Maryland Uniform Trade Secrets Act, Md. Code Ann., Com. Law §§ 11-1201 through 11-1209 (the "MUTSA"); (iv) breach of the Papaya Contract; (v) quantum meruit and (vi) unjust enrichment, each in the alternative to the contract claim; (vii) fraudulent inducement; and (viii) unfair competition.

106. Papaya's contract and quasi-contract claims rest entirely on a theory of agency: Papaya alleges that "[a]t all relevant times, LCN acted as Haven Health's agent regarding the Publisher Agreement" and that Haven is bound to the Papaya Contract as a "disclosed principal." Compl. ¶¶ 65–66, 159–160.

107. Papaya's fraudulent-inducement claim likewise rests principally on representations Papaya alleges Haven made "through its agent LCN." Compl. ¶ 205.

108. Papaya seeks, among other things: compensatory damages alleged to be no less than $1,462,500 and continuing to accrue at approximately $2,250 per day; a prorated early-termination fee of $32,020 under the Papaya Contract; exemplary damages of twice its actual damages under the DTSA; disgorgement of unspecified profits, punitive damages; attorneys' fees; and permanent injunctive relief. See Compl. ¶¶ 128, 157, 166–167, 185 & Prayer for Relief.

109. Haven denies Papaya's allegations and denies any liability to Papaya.

110. If, however, Papaya's allegations were credited in any respect, Haven's resulting exposure would exist only because of LCN's conduct: LCN's unauthorized representations to

Papaya; LCN's undisclosed contract with Papaya; LCN's concealment of Papaya's claimed proprietary rights and use restrictions; and LCN's failure to pay Papaya.

111. Haven has incurred, and will continue to incur, substantial attorneys' fees, costs, and expenses in defending the Underlying Action.

## COUNT I — BREACH OF CONTRACT

112. Haven repeats and realleges paragraphs 1 through 111 above as if fully set forth herein.

113. The Haven Agreement is a valid and enforceable contract between Haven and LCN. In the alternative, the Campaign parameters agreed between Haven and LCN in or about April 2023 — including LCN's agreement to deliver Billable Calls at $75 per call, LCN's invoices, and Haven's payment of those invoices — constitute a valid and enforceable contract between Haven and LCN, formed against the backdrop of, and incorporating the structure of, the parties' course of dealing (together with the Haven Agreement, the "Haven-LCN Agreements").

114. Haven performed all of its obligations under the Haven-LCN Agreements, including by paying all invoiced amounts.

115. LCN materially breached the Haven-LCN Agreements by, among other things: (a) holding itself out to Papaya — without authority, and contrary to Section 5's express disclaimer of any agency, affiliation, association, alliance, or mutual enterprise — as Haven's agent and exclusive representative; (b) purporting to contract with a publisher on Haven's behalf and for Haven's account, rather than in LCN's own name and on its own behalf as LCN represented it would do in Section 6(b) of the Haven Agreement; (c) purporting to bind Haven to material obligations to a third party without Haven's knowledge or authorization; (d) concealing from Haven the existence and terms of the Papaya Contract and Papaya's claimed proprietary rights in,

and restrictions on, the Campaign materials; and (e) failing to perform its obligations diligently and in good faith.

116. LCN's conduct described herein was reckless, undertaken in bad faith, and/or fraudulent.

117. Accordingly, by its own terms, the limitation of liability in Section 7 of the Haven Agreement does not apply to LCN's liability for that conduct.

118. In the alternative, Section 7 is unenforceable as applied to LCN's reckless, bad-faith, willful, and/or fraudulent conduct.

119. As a direct, proximate, and foreseeable result of LCN's breaches, Haven has been damaged, including by: (a) the attorneys' fees, costs, and expenses Haven has incurred and will incur in defending the Underlying Action; (b) any amounts Haven may be required to pay Papaya by judgment or settlement in the Underlying Action; and (c) the amounts Haven paid LCN for Billable Calls for which Papaya now seeks payment from Haven a second time.

120. Haven is entitled to recover its damages from LCN in an amount to be proven at trial.

**COUNT II — FRAUD**
**(Pleaded in the Alternative to Count I)**

121. Haven repeats and realleges paragraphs 1 through 120 above as if fully set forth herein.

122. Count II is pleaded in the alternative to Count I pursuant to Federal Rule of Civil Procedure 8(d)(2).

123. In Section 6(a) of the Haven Agreement, LCN represented to Haven, as a statement of present fact, that LCN generates pay-per-call services through online and offline advertising and "in-house activities."

124. In Section 6(b), LCN represented to Haven, as a statement of present fact, that LCN itself "purchases media from third party publishers and marketing agencies" and that LCN "has Agreements with the vendors."

125. LCN repeated and reaffirmed the substance of these representations in connection with the Campaign, when LCN held itself out to Haven as the party that would generate and deliver the calls LCN sold to Haven.

126. Specifically, on or about April 10, 2023, Stan Burns, on behalf of LCN, represented to Kirill Vesselov that LCN was considering entering into a contract with an undisclosed publisher that "LCN has a relationship with," and that LCN would "exclusively represent LCN publisher to provide services to Advertiser," and that "LCN publisher will . . . be paid directly by LCN."

127. Upon information and belief, LCN's representations were false when made in the Haven Agreement and false when reaffirmed on April 10, 2023.

128. Upon information and belief, since at least March 2022, none of the addiction-treatment calls LCN sold Haven Health were generated by LCN's in-house activities; rather, upon information and belief, many or all of those calls were generated by Papaya, through advertising campaigns that Papaya created and managed. *See* Compl. ¶¶ 51–60.

129. And in April 2023, LCN did not contract with Papaya solely in LCN's own name and on its own behalf in the manner described in Section 6(b) of the Haven Agreement; instead, upon information and belief, LCN purported — falsely and without authority — to contract "on behalf of" Haven. *See* Compl. ¶¶ 61–66.

130. LCN also concealed from Haven material facts that LCN had a duty to disclose by reason of its superior and exclusive knowledge, its partial and misleading representations, and the exclusive-conduit structure that LCN itself imposed on all publisher relationships: the existence and terms of the Papaya Contract; Papaya's identity and role in generating the Campaign calls; LCN's undisclosed $25-per-call margin; and Papaya's claim that the Campaign materials were proprietary, confidential, and subject to restrictions on use.

131. LCN made the foregoing misrepresentations and omissions knowingly, or with reckless disregard for their truth, and with the intent that Haven rely upon them by entering into, continuing, and paying for the Campaign.

132. Haven justifiably relied on LCN's misrepresentations and omissions, given the parties' three-year course of dealing, the express representations in the Haven Agreement, and the structure — imposed by LCN — under which LCN was Haven's sole conduit to any publisher.

133. As a direct and proximate result of LCN's fraud, Haven has suffered damages separate and distinct from its contract damages, including its exposure to Papaya's tort and statutory claims (including claims for exemplary and punitive damages), the attorneys' fees, costs, and expenses of defending those claims, and its payment of an undisclosed and inflated per-call margin, in an amount to be proven at trial.

## COUNT III — BREACH OF AGENCY AND FIDUCIARY DUTIES
**(Pleaded in the Alternative — Only if LCN Is Found to Have Acted as Haven's Agent)**

134. Haven repeats and realleges paragraphs 1 through 133 above as if fully set forth herein.

135. Haven denies that LCN was its agent for any purpose. Count III is pleaded solely in the alternative, pursuant to Federal Rule of Civil Procedure 8(d)(2) and (d)(3), and arises only

if and to the extent the trier of fact determines — as Papaya alleges — that LCN acted as Haven's agent in connection with the Papaya Contract or the Campaign.

136. If LCN acted as Haven's agent, then LCN owed Haven the duties that an agent owes its principal, including duties of loyalty, good faith, candor and full disclosure of material facts, obedience, and the duty to act only within the scope of its actual authority.

137. If LCN acted as Haven's agent, LCN breached those duties by, among other things: (a) exceeding any authority it possessed by purporting to bind Haven to the Papaya Contract and its terms — including the no-duplication covenant, the $45,000 early-termination penalty, and confidentiality obligations; (b) failing to disclose to Haven the existence and terms of the Papaya Contract, Papaya's identity and role, and Papaya's claimed proprietary rights and use restrictions; (c) taking a secret, undisclosed profit of $25 per Billable Call — charging its purported principal $75 per call while paying Papaya $50 per call for the very same calls — without disclosure to, or consent from, Haven; and (d) preferring its own financial interests over those of its purported principal, thereby exposing Haven to the claims asserted in the Underlying Action.

138. As a direct and proximate result of LCN's breaches of its agency and fiduciary duties, Haven has been damaged, including by its exposure to, its costs of defending, and any liability imposed upon it in the Underlying Action.

139. In addition to its damages, Haven is entitled to disgorgement of all secret profits LCN obtained in connection with its disloyalty — including the $25-per-call margin — and to forfeiture of compensation paid to LCN during the period of its disloyalty, under applicable law.

## COUNT IV — COMMON-LAW INDEMNIFICATION

140. Haven repeats and realleges paragraphs 1 through 139 above as if fully set forth herein.

141. Haven denies all liability to Papaya. If, however, Haven is found liable to Papaya on any claim asserted in the Underlying Action, such liability would be solely vicarious, secondary, or imputed to Haven by operation of law — that is, liability imposed upon Haven not for any wrongdoing of its own, but as the purported principal of LCN, based upon representations LCN made, a contract LCN signed, obligations LCN undertook and failed to perform, and information LCN possessed and withheld.

142. Specifically: (a) Papaya's contract and quasi-contract claims rest entirely on the allegation that LCN, as Haven's purported agent, bound Haven to the Papaya Contract; (b) Papaya's fraudulent-inducement claim rests on representations allegedly made "through" LCN; and (c) any liability of Haven on Papaya's trade-secret and unfair-competition claims could arise, if at all, only from conduct Haven undertook without knowledge of Papaya's claimed rights or restrictions.

143. Haven did not authorize, direct, control, participate in, or have knowledge of LCN's wrongful conduct, and Haven committed no independent wrong.

144. As between Haven and LCN, LCN is the party whose conduct was the actual, primary, and active cause of any injury Papaya may establish: LCN made the representations to Papaya; LCN signed the Papaya Contract; LCN owed, and failed to make, the payments to Papaya; LCN knew of and concealed Papaya's claimed restrictions; and LCN arranged the transfer of the campaign materials.

145. If Haven is held liable to Papaya in any amount, whether by judgment or settlement, Haven is entitled to common-law (implied) indemnification from LCN for the full amount of such judgment or settlement, together with the attorneys' fees, costs, and expenses Haven has incurred and will incur in defending the Underlying Action.

**COUNT V — CONTRIBUTION**
**(Pleaded in the Alternative to Count IV)**

146. Haven repeats and realleges paragraphs 1 through 145 above as if fully set forth herein.

147. Count V is pleaded in the alternative to Count IV. Haven denies all liability to Papaya and denies that any tort was committed against Papaya by anyone.

148. If, however, Haven is found liable to Papaya on any claim sounding in tort — including Papaya's claims under the DTSA & MUTSA, for fraudulent inducement, or for unfair competition — then LCN is jointly and severally liable to Papaya for the same injury.

149. LCN's culpable conduct with respect to any such injury includes: making the alleged misrepresentations to Papaya regarding LCN's authority and its purported principal's intentions; entering into the Papaya Contract with knowledge of Papaya's claimed proprietary rights and use restrictions; arranging and facilitating the placement of Papaya's claimed trade secrets into Haven's account; failing to pay Papaya amounts LCN owed; and retaining for itself the benefits of the arrangement.

150. If Haven is held liable to Papaya on any such claim, Haven is entitled to contribution from LCN in an amount commensurate with LCN's proportionate share of fault, pursuant to the Maryland Uniform Contribution Among Joint Tort-Feasors Act, Md. Code Ann., Cts. & Jud. Proc. §§ 3-1401 through 3-1409, and/or N.Y. C.P.L.R. 1401 and 1402, and/or such other law as the Court determines to apply.

**COUNT VI — UNJUST ENRICHMENT AND MONEY HAD AND RECEIVED**
**(Pleaded in the Alternative)**

151. Haven repeats and realleges paragraphs 1 through 150 above as if fully set forth herein.

152. Count VI is pleaded in the alternative to Haven's contract claims in Count I, to the extent any payment or obligation at issue is determined not to be governed by an enforceable contract between Haven and LCN.

153. Haven paid LCN $75 per Billable Call for the calls delivered during the Campaign — the same calls for which Papaya now seeks payment of $50 per call from Haven, and the same calls for which LCN agreed, in the Papaya Contract, to pay Papaya.

154. Upon information and belief, LCN retained monies paid to it by Haven that LCN owed, but failed to remit, to Papaya, together with an undisclosed margin of $25 per call.

155. LCN was thereby enriched at Haven's expense. If Haven is required to pay Papaya for the same calls, or is otherwise held liable on Papaya's claims, equity and good conscience do not permit LCN to retain the monies Haven paid to it.

156. Haven is entitled to restitution from LCN of all amounts by which LCN has been unjustly enriched, in an amount to be proven at trial.

## COUNT VII — DECLARATORY JUDGMENT
**(28 U.S.C. §§ 2201–2202)**

157. Haven repeats and realleges paragraphs 1 through 156 above as if fully set forth herein.

158. An actual, ripe, and justiciable controversy exists between Haven and LCN concerning their respective rights and obligations with respect to the Papaya Contract and the claims asserted in the Underlying Action.

159. Haven contends — and, upon information and belief, LCN disputes — that, as between Haven and LCN: (a) LCN had no authority to enter into the Papaya Contract on Haven's behalf or to bind Haven to any of its terms; (b) LCN alone bears responsibility for any payment or

other obligation arising under the Papaya Contract, including any obligation to pay Papaya for calls and any early-termination fee; and (c) LCN must bear responsibility for any loss arising from the conduct alleged herein.

160. A declaratory judgment will serve a useful purpose in clarifying and settling the legal relations at issue and will afford relief from the uncertainty, insecurity, and controversy giving rise to this proceeding.

161. Haven is entitled to a judgment declaring that, as between Haven and LCN, LCN bears sole responsibility for any and all obligations under or arising out of the Papaya Contract, and for any loss arising from LCN's conduct alleged herein.

## COUNT VIII — REFORMATION
**(Pleaded in the Alternative, Solely to the Extent Necessary)**

162. Haven repeats and realleges paragraphs 1 through 161 above as if fully set forth herein.

163. Count VIII is pleaded in the alternative and solely to the extent the Court determines that the written identification of the Advertiser in the Haven Agreement controls over the parties' actual agreement, intent, and course of performance.

164. At the time the Haven Agreement was executed, LCN and Haven mutually intended and understood that Haven — Haven Health Management, LLC — was the Advertiser and counterparty to the Haven Agreement.

165. By mutual mistake, the written instrument identified the Advertiser as "Haven Behavioral Healthcare, LLC."

166. The parties' course of performance — under which LCN performed for Haven, invoiced Haven, and was paid by Haven — confirms the parties' true agreement and intent.

167. To the extent necessary, Haven is entitled to reformation of the Haven Agreement to identify Haven Health Management, LLC as the Advertiser, so as to conform the written instrument to the parties' true agreement and mutual intent.

**PRAYER FOR RELIEF**

WHEREFORE, Defendant/Third-Party Plaintiff Haven Health Management, LLC respectfully requests that the Court enter judgment in its favor and against Third-Party Defendant Live Calls Network, LLC as follows:

(a) On Counts I, II, and III, awarding Haven compensatory and consequential damages in an amount to be proven at trial, including the attorneys' fees, costs, and expenses Haven has incurred and will incur in defending the Underlying Action;

(b) On Counts IV and V, awarding Haven judgment over and against LCN for all or any part of any judgment entered in favor of Papaya and against Haven in the Underlying Action, and for any settlement paid by Haven, together with Haven's attorneys' fees, costs, and expenses of defense;

(c) On Count III, ordering disgorgement of all secret profits obtained by LCN — including the $25-per-call margin — and forfeiture of compensation paid to LCN during the period of its disloyalty;

(d) On Count V, in the alternative, awarding Haven contribution from LCN in an amount commensurate with LCN's proportionate share of fault;

(e) On Count VI, awarding Haven restitution of all amounts by which LCN has been unjustly enriched;

(f) On Count VII, declaring that, as between Haven and LCN, LCN bears sole responsibility for any and all obligations under or arising out of the Papaya Contract and for any loss arising from the conduct alleged herein;

(g) On Count VIII, in the alternative and to the extent necessary, reforming the Haven Agreement to identify Haven Health Management, LLC as the Advertiser;

(h) Awarding Haven pre-judgment and post-judgment interest as permitted by law;

(i) Awarding Haven its costs in this action; and

(j) Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Haven demands a trial by jury on all claims and issues so triable.

Dated: August 18, 2026
New York, New York

Respectfully submitted,

**ARMSTRONG TEASDALE LLP**

By: *__/s/ Andrew T. Lolli__*
Andrew T. Lolli
400 Park Avenue, 12th Floor
New York, NY 10022
(212) 209-4400
alolli@atllp.com

Richard L. Brophy (pro hac vice)
Melanie E. King (pro hac vice)
7700 Forsyth Blvd., Suite 1800
St. Louis, Missouri 63105
(314) 621-5070
rbrophy@atllp.com
meking@atllp.com

*Attorneys for Defendant/Third-Party Plaintiff*
*Haven Health Management, LLC*